2 So.2d 616

**THOMAS et al. v. DAVIS et al.**

4 Div. 196.

Supreme Court of Alabama.

May 22, 1941.

M. B. Grace, of Birmingham, for appellants.

H. A. Ferrell, of Seale, for appellees.

THOMAS, Justice.

The prayer of the amended bill was for cancellation of certain conveyances and for an accounting.

Eli Jackson, Sr., who was about ninety-five years of age at the time of his certain conveyances, lived about six miles from Hurtsboro, and owned a tract of land containing about 123½ acres. He died in the year 1930, leaving four children: Lila Andrews, a daughter, who lives in Birmingham, Alabama; a son, Nem Jackson, now dead, who lived in Cincinnati, Ohio; a son, Eli Jackson, Jr.; and a daughter, Fannie Thomas, who lived with him on the property near Hurtsboro.

Fannie Thomas was the wife of Will Thomas. Prior to the year 1928, it is alleged in the amended bill, the Bank of Hurtsboro sold to Will Thomas certain live stock, mules and horses, which had died. Will Thomas was a tenant farmer, working most of the time for one of the officers of the Bank of Hurtsboro and on the place of said officer. The Bank of Hurtsboro is a banking institution, located at Hurtsboro, Ala. T. S. Davis and W. T. Davis were officers of the bank.

On February 20, 1928, an officer of the bank prepared a deed to be executed by Eli Jackson, Sr., conveying forty acres of his land to his son Eli Jackson, Jr. Two days later, on February 22, 1928, another deed in like respects was prepared by the bank's official, to be executed by the old man, conveying the remainder of his land, eighty-three and one-half acres, to his daughter Fannie Thomas, who lived with him. These deeds were acknowledged by the

same notary public. Eli Jackson executed both deeds by signing his name to it by his cross mark. The notary public executed the certificate of acknowledgment and signed as a witness to the signature of the grantor. Both deeds were recorded in the office of the judge of probate. This disposed of all the land the grantor owned to the two children in question, the one living with him, and the other paying off his large indebtedness.

Subsequent to the execution of the deed conveying the land to the daughter (on the 5th day of March, 1932), the officers of the bank prepared a mortgage to be executed by Fannie Thomas and her husband, Will Thomas, conveying the land to the Bank of Hurtsboro, as security for an indebtedness owing to the bank by Will Thomas and Will Thomas carried his wife to the bank for the purpose of executing the mortgage. It is alleged that she objected to executing the mortgage with her land pledged as security on the indebtednesss of Will Thomas to the bank, but she was prevailed upon to execute the same and signed her name by her cross mark. The mortgage secured an indebtedness of $466 and was represented by their promissory note payable to the bank and due October 1, 1932. Three parties were present at the time it was executed, W. T. Davis, Will Thomas and his wife Fannie Thomas. A mule, cow, yearling and the eighty-three acres of land were included in the mortgage as security. The mule belonged to Will Thomas and the cow and yearling to his wife.

The signature to the mortgage and certificate of acknowledgment is as follows:

"The State of Alabama,
"Russell County.
"I ———— in and for said County, in said State, hereby certify that ———— whose name ———— signed to the foregoing conveyance, and who ———— known to me, acknowledged before me on this day that, being informed of the contents of the conveyance,—he— executed the same voluntarily on the day the same bears date.
"Given under my hand this ———— day of ———— A. D. 19—
"Claude P. Glass N.P.
"N.P.
"(Seal)
"The State of Alabama
"Russell County.
"I, ———— in and for said County and State, do hereby certify that on the ———— day of ———— 19—, came before me the within named ———— known to me to be the wife of the within named ————, who, being by me examined separate and apart from the husband touching her signature to the foregoing conveyance, acknowledged that she signed the same of her own free will and accord, and without fear, constraint, or threats on the part of the husband.
"In Witness Whereof, I hereunto set my hand this ———— day of ————, 19—.
"Claude P. Glass, N.P.
"(Seal)"

Default was made in the payment of the indebtedness secured by the mortgage and on January 24, 1933, the mortgage was sought to be foreclosed under the power contained in it and the Bank of Hurtsboro purchased the property at foreclosure sale. Foreclosure deed was duly executed to the bank, filed in the office of the judge of probate for record on January 25, 1933, and recorded in Vol. 162, p. 550, Records of Deeds. The bank's attorney acted as attorney for it and as auctioneer and handled the foreclosure proceedings. The evidence is to the effect that the original mortgage was turned over to him and it has been misplaced. The foreclosure deed conveys the land pledged as security, but no mention is made of the personal property which was also pledged as security.

The bank kept the property for about one year and transferred it to a trustee for Mr. Davis and wife. C. D. Cade as such trustee conveyed the property to W. T. Davis and wife, Annie P. Davis. Mr. Davis was cashier of the Bank of Hurtsboro and the party who procured the execution of the deeds by Eli Jackson, Sr., to the latter's son and daughter, and was one of the parties present when the mortgage was executed by Fannie Thomas and her husband Will Thomas to the bank.

By amendment of the bill of complaint, Fannie Thomas raised questions of the validity of the mortgage executed March 5, 1932, on several grounds: (a) that it was executed as security for the debt of her husband, (b) that it was void because there were no certificates of acknowledgment to the mortgage, (c) that the mortgage was executed by the mortgagors executing it by their marks and their signatures to the mortgage were attested by only one witness, and (d) that the property mortgaged as security was a homestead and neither of the mortgagors appeared before the notary public and acknowledged the

execution of the same, and (e) that the notary public did not duly take the acknowledgments required by statute from grantors in the mortgaging of a homestead.

In the year 1932, the same year, the mortgage was executed and foreclosed, Fannie Thomas and her husband Will Thomas cultivated and raised two and one-half bales of cotton on the land conveyed as security, each bale weighing more than 500 pounds, and turned them over to the bank, also the seed therefrom and some corn. The cotton was shown to have been worth from 13½ to 15 cents per pound, and the fifty bushels of corn was worth 50 cents per bushel.

Will Thomas and Fannie Thomas did not know the mortgage had been foreclosed and the bank allowed them to remain on the property and raise a crop in the year 1933. That year they raised two bales and a remnant of a bale of cotton, which was turned over to the bank, together with the seed out of the cotton. That fall, after the bank had received the cotton and cotton seed and corn, it dispossessed the parties and took one mule, one cow and yearling also pledged as security.

In the year 1933 the bank went through a form of liquidation, the stock of the stockholders was sold and new officers of the bank elected, but the corporation was not changed. Mrs. Annie P. Davis, one of the respondents, claimed that the indebtedness secured by the mortgage executed March 5, 1932, was the indebtedness of Fannie Thomas. She testified that the permanent books and records of the bank would show the account in the name of Fannie Thomas, that they were stored in an outhouse and the rain had ruined them, and for that reason, she said that she could not bring the books into court. Fannie Thomas denied having owed the Bank of Hurtsboro, but said her husband Will Thomas had dealt with the bank and made arrangements with that institution or officers for her to get $7 per month for five or six months during crop season; and that her husband Will Thomas was working for one of the Davises.

Testimony was taken before the Register. The court rendered a decree in favor of the respondents and against the complainants, and held among other things, the two deeds executed by Eli Jackson, Sr., conveying his land to Eli Jackson, Jr., and Fannie Thomas were valid; that Fannie Thomas did not come into court with clean hands and that the mortgage executed by Fannie Thomas and Will Thomas to the Bank of Hurtsboro dated March, 1932, was not void as being given as security for the debt of her husband and the foreclosure deed was valid. The court ruled on the validity of the deeds and mortgage executed March 5, 1932, to the Bank of Hurtsboro, saying: "It is further ordered, adjudged and decreed that the two conveyances from Eli Jackson, Sr., to his son and daughter, respectively, are hereby declared to be valid in all respects; that the mortgage to the Bank of Hurtsboro, founded on one of said conveyances, and its subsequent foreclosure and the deed executed as the result of said foreclosure sale, be and the same are hereby declared to be valid and binding in all respects as it is ascertained by the Court that the maker of said deeds, the said Eli Jackson, Sr., had sufficient mental capacity to make and execute the same."

The mortgage of March 5, 1932, was void for the reasons that it had no certificates of acknowledgment, was executed by grantors' marks and was not attested by two witnesses as required by law. Code of 1923, §§ 6838, 6840, 6845, Code 1940, Tit. 47, §§ 22, 24, 30; Henderson v. Kirkland et al., 127 Ala. 185, 28 So. 674; Russell v. Holman, 156 Ala. 432, 47 So. 205. The decisions of this court are to the effect that an attempted conveyance of lands in a manner other than as required by the statute is void. Code of 1923, § 6838, et seq., Code 1940, Tit. 47, § 22 et seq.; Metropolitan Life Ins. Co. v. Estes, 228 Ala. 582, 155 So. 79; Hollimon v. McGregor, 225 Ala. 517, 143 So. 902; Copeland v. Dabbs, 221 Ala. 489, 129 So. 88.

It is not necessary to adduce further authority on the question being considered, the validity vel non of the mortgage of date of March 5, 1932, and sought to have been foreclosed and evidenced by the auctioneer's deed. We may say, however, that it is established that two elements are essential to the validity of a certificate to a conveyance of land, or a mortgage against land: (1) it must clearly identify the person who executed the conveyance; and (2) it must show the person making the acknowledgment appeared in person before the officer taking the acknowledgment and was personally known to him or was identified to him, as the

statute directs, as the individual who executed the instrument. Cox v. Holcomb, 87 Ala. 589, 6 So. 309, 13 Am.St.Rep. 79; Cooper v. Pearce, 222 Ala. 540, 133 So. 583; Cheney v. Nathan, 110 Ala. 254, 20 So. 99, 55 Am.St.Rep. 26.

■ A certificate of acknowledgment which leaves the name of the grantor blank, even though it is signed by the notary public, or officer executing the certificate, and bears his seal of office, is a nullity. Jackson v. Kirksey, 110 Ala. 547, 18 So. 304; Chattanooga Nat'l B. & L. Ass'n v. Vaught, 143 Ala. 389, 39 So. 215.

■ The act of certifying an acknowledgment is the exercise of a judicial function, and it is necessary that the officer have actual jurisdiction of the party making the acknowledgment and that the party actually appear before him and acknowledge that he or she actually signed and executed the deed or mortgage. Fies & Sons v. Lowery, 226 Ala. 329, 331, 147 So. 136; Woodlawn B. & L. Ass'n v. Maddox, 229 Ala. 475, 158 So. 310.

■ We have examined the voluminous record and are of the opinion that the deeds by Eli Jackson, Sr., of date of February 20, 1928, to Eli Jackson, Jr., and that of February 22, 1928, by the same grantor to Fannie Thomas were valid and binding and that the grantor "had sufficient mental capacity to make and execute the same."

We are of opinion that the trial court was in error in giving validity to the mortgage and foreclosure deed in question.

■ It is the rule of our cases that one who comes into equity must come with clean hands.

■ In a proper case there must be submission to the court in the offer to do equity and to accede to whatever decree the court sees fit to render in the premises. In the instant case, however, the complainant Fannie Thomas had the right, under our statute (Code of 1923, § 8272, Code 1940, Tit. 34, § 74), and decisions (People's Bank v. Barrett, 219 Ala. 258, 121 So. 910; Ex parte Lacy, 232 Ala. 525, 168 So. 554, citing Van Derslice v. Merchants' Bank, 213 Ala. 237, 241, 104 So. 663, with approval; Dewberry v. Bank of Standing Rock, 227 Ala. 484, 150 So. 463; Mitchell et al v. Sessoms Gro. Co., 228 Ala. 360, 153 So. 282), as a married woman who executed a mortgage against her property to secure the debt of her husband to invoke the aid of a court of equity to set aside the mortgage so given, and she is not deprived of that right or remedy on the grounds of waiver or estoppel, and comes into court with clean hands.

■ The question of novation of debts has often been considered by the courts. Tuscaloosa Lumber Co. v. Tropical Paint & Oil Co., 211 Ala. 258, 100 So. 236. The evidence convinces us that the amounts of the several mortgages were the carrying forward of the indebtedness of the parties into the alleged last mortgage of March 5, 1932. This view is supported by the effort of foreclosure of the last mortgage, and the failure to rely upon or attempt to foreclose the respective older mortgages of dates January 20, 1930, for $515 and March 1, 1931, for $422.50, to the same grantees. These notes and mortgages are in like form of that of date of March 5, 1932, for $466, sought to be cancelled by this amended bill.

The record shows that the husband of Fannie Thomas dealt with the bank, or its official; that Will Thomas was under the direction, domination or control of an active alter ego of the bank as a "wages hand" and that this official of the bank procured the instruments in question and the mortgage sought to be cancelled.

The evidence of Eli Jackson, Jr., shows that he paid to the Farmers & Merchants Bank the original debts against his father's land of $650, and that was when he surrendered the father's deed to him for sixty acres of the land, which was conveyed to Fannie Thomas, and when he accepted in lieu thereof the lands he now holds, the said forty acres. He testified as follows:

"Q. Was your father present at that time? A. Yes, Papa was setting down there.

"Q. What did Mr. Davis say to your father, if anything, about signing the deed which he had prepared for your father to sign conveying the forty acres of land to you, Eli Jackson, Jr.? A. What did he say to me?

"Q. Now, what did Mr. Davis say to your father? A. He just told him he just had to give me a deed—had to give us a deed.

"Q. Did you give your father any money or anything else in consideration for him to execute the deed to you? Did you pay him any money for the deed? A. I paid the debt on the place.

"Q. What debt on the place was it that you paid? A. Fannie Thomas'.

"Q. How much did you pay? A. About $650.00.

"Q. And which one of the Davises was it told your father he would have to execute the deed conveying the 40 acres to you? A. The young Davis—Mr. W. T. Davis.

"Q. Was he an officer or an agent of the Bank of Hurtsboro, at that time? A. Yes, sir."

Mrs. Davis says of these transactions: "Eli Jackson, Sr., had never done business with the Bank of Hurtsboro, before 1928. At that time he came to Mr. T. S. Davis to aid him in a dispute he was having with Eli Jackson, Jr., Mr. W. T. Davis opposed Eli Jackson, Sr., deeding this land to Fannie. Thomas and Mr. T. S. Davis was in favor of it, and that is the main thing—the principal thing—that I remember about the execution of this deed was the misunderstanding between my husband, W. T. Davis, and Mr. T. S. Davis."

Of Eli Jackson, Sr.'s, mental condition, Mrs. Davis testified: "What was his mental condition? A. I considered it unusually good for a negro his age."

The husband of Fannie Thomas, Will Thomas, was under the control of the Davises, the moving agents in the several transactions which are under consideration here.

We advert to the foregoing to indicate the transactions touching the Jacksons, the Thomases and the two banks, the Davises and the lands in question, in order to get the facts and influences that actuated, affected and effectuated as to the several parties and conveyances dealt with and exhibited in the pleadings and evidence in and under the amended bill for cancellation of the mortgage debt of March 5, 1932, and the auctioneer's deed attesting the alleged foreclosure of the void mortgage.

 The burden of proof and duty of the liquidating agents of the bank was to show how, or in whose name, the instant account was kept. A period of ten years was not unreasonable to expect that the permanent records of the Bank of Hurtsboro as conducted by the Davises should have been maintained and the subject of production. The reason given for the failure to produce is not a sufficient discharge of the burden of going forward with the evidence that rested upon or was imposed on the respondents in the respects here important. This failure is an inference against the appellee-respondent and the reason for this failure is insufficient to discharge the burden of proof.

 The whole evidence being considered Fannie Thomas had the right to become a complainant rather than remain a respondent in this case. In so doing she has violated no rule of law or equity, and is not shown to have committed any deed or done any act that would subject her to the charge of being a party with unclean hands and to whom a court of equity would on such grounds deny relief.

At the risk of repetition, it should be pointed out here that the records show, on February 20 and 22, 1928, the deeds of Eli Jackson, Sr., were respectively executed before Claude P. Glass, a notary public, to his son Eli Jackson, Jr., and to his daughter Fannie Thomas. The record further shows that this son procured a loan and paid the indebtedness of Eli Jackson, Sr., to the parties entitled thereto, thus paying for his lands, as he stated in his evidence, excerpt of which is set out above.

It is further shown in the evidence that Fannie Thomas and her husband Will Thomas were indebted (one or both of them) to the Bank of Hurtsboro, as evidenced by mortgages of date of January 20, 1930, in the sum of $515, and March 7, 1931, in the sum of $422.50, and purporting to mortgage the same lands, the black mare mule named Mary, the red cow named Sally and the rent note for 500 lbs. of middling cotton, and said mortgages were executed by mark before the notary public Claude P. Glass. These instruments evidenced a large indebtedness from William Thomas or his wife Fannie to the Bank of Hurtsboro that under the reasonable inferences afforded by the record could not have been incurred within the short time succeeding the execution of the deed from the father to his daughter Fannie. We are impressed from a careful consideration of the whole record, that the bank was interested in securing this indebtedness and an executive officer thereof actively participated in the procuring of the deed and mortgages in question.

Adverting to the last mortgage in question again, here sought to be cancelled, the indebtedness of March 5, 1932, was fixed at $466, and was sought to be secured by the same personal property and the same 83½ acres of land. The reasonable interpretation of this whole record is to the ef-

278

fect that the husband's debt was thus sought to be secured by a mortgage on the wife's land invested in her by the aged father, and with the active advice and help of an executive officer of the bank named.

The case of Henderson v. Kirkland, 127 Ala. 185, 28 So. 674, 675, is very similar to the case at bar. Neither of the mortgagors were able to write their name and signed the mortgage by mark and John Adams attested their signature. The court held the mortgage was not properly attested, saying: "The method of conveyance here prescribed is exclusive, the rule being, that 'when a statute limits a thing to be done in a particular manner, it includes in itself a negative; and the negative is, that it shall not be done otherwise. The limitation exists whenever the statute prescribes the particular manner in which the thing must be done.' Bickley v. Keenan, 60 Ala. 293; Hendon v. White, 52 Ala. 597. It follows, that the mortgage from the defendants to the complainants,—signed by the defendant, J. L. V. Kirkland, who could not write, by his name being written for him by another, with the words 'his mark' over or against the same, in the presence of but one witness,—was inoperative, and of no effect to convey the legal title. For that purpose, it was a nullity. The theory on which complainants propose to maintain their bill, however, is, that the mortgage is good as an agreement to convey and may be enforced as such. However that may be as to lands which do not constitute the homestead of the mortgagor, it breaks down as this court has more than once held, and has no application to conveyances of the homestead. * * *"

Such is the case for decision—the lands being the wife's property and her homestead.

Under Section 8269, Code of 1923, Code 1940, Tit. 34, § 73, a wife cannot alienate her land or mortgage it without the assent of the husband, and such assent must be manifested by him joining in the alienation in the mode prescribed by law for the execution of conveyances of land. Cooper v. Pearce, 222 Ala. 540, 133 So. 583. The words "mode prescribed by law for the execution of conveyances of land" mean that the deed, mortgage or other conveyance of land must be duly acknowledged before a proper officer, or must be attested as the statute directs. Under Section 8273, Code of 1923, Code 1940, Tit. 34, § 75, all the property of the wife is her separate property and is subject to all the provisions of the said chapter of the Code.

The foregoing is pertinent to the conveyance of a homestead embraced in the mortgage sought to be cancelled of record.

In Abercrombie v. Carpenter et al., 150 Ala. 294, 43 So. 746, 747, the court said: "The crowning glory of courts of equity is to protect the weak and ignorant from imposition by the strong and intelligent, and while it is true that certain relations of life have been definitely pointed out as raising a presumption of confidence and dependence, yet the general principle is that when one who is strong and well-informed deals with one who is ignorant, weak, and occupying a position of dependence or subordination, the stronger should exercise that uberrima fides in his dealings which leaves no trace of imposition. Mr. Pomeroy says: 'When the accompanying incidents are inequitable and show bad faith, such as concealments, misrepresentations, undue advantage, oppression on the part of one who obtains the benefit, or ignorance, weakness of mind, sickness, old age, incapacity, pecuniary necessities, and the like, on the part of the other, these circumstances, combined with inadequacy of price, may easily induce a court to grant relief, defensive or affirmative.' 2 Pomeroy's Eq.Jur. (3d Ed.) pp. 1670, 1671, § 928. See, also, Kloepping v. Stellmacher, 21 N.J.Eq. 328, 331; Balkum v. Breare, 48 Ala. 75, 79; Burke v. Taylor, 94 Ala. 530, 533, 10 So. 129. * *"

In Kirby v. Arnold, 191 Ala. 263, 68 So. 17, 19, this Court said:

"Mr. Beach says: 'There are cases, where there is no positive evidence of fraud, and yet the inequality of the bargain is so gross that the mind cannot resist the inference that it was improperly obtained. In such cases a court of equity avoids the bargain, not merely on account of its gross inequality, but because such inequality furnishes the "most vehement presumption of fraud."' 1 Modern Eq.Jur. § 143; Parmelee v. Cameron, 41 N.Y. 392; Dunn v. Chambers, 4 Barb.(N.Y.) 376.

"In Chesterfield v. Janssen, 2 Ves.Sen. 125, it was laid down by Lord Hardwicke that equity has jurisdiction to relieve against every species of fraud. And in the leading modern case of Slim v. Croucher, 1 De G., F. & J. 518, Lord Justice Turner observed that if the court were not to grant relief, in such cases it would be very much narrowing an old jurisdiction of the court, by confining it to cases in which the

jurisdiction has been exercised; that it would be 'taking the cases as the measure of the jurisdiction, instead of as examples of that jurisdiction.'

"The rule as laid down in Earl of Aylesford v. Morris, L.R. 8 Chap.App. 484, is that from the circumstances or conditions of the parties contracting—weakness on one side, usury on the other, or extortion or advantage taken of that weakness—a presumption of fraud arises; and in this connection it may be said that: 'Fraud does not mean deceit or circumvention, but means an unconscientious use of the power arising out of these circumstances and conditions, and, where the relative positions of the parties is such as prima facie to raise the presumption, the transaction cannot stand unless the person claiming the benefit of it be able to repel the presumption by contrary evidence proving it in point of fact to have been just and reasonable.'
* * *

" 'Where a fraudulent advantage has been taken of the fears, the affections, or the sensibilities of a party, equity will grant relief. Judge Story says that circumstances of extreme necessity and distress of a party, though not accompanied by any direct restraint or duress, may so entirely overcome his free agency as to justify the court in setting aside a contract made by him on account of some oppression or fraudulent advantage or imposition attendant upon it.' "

 We hold that the several transactions: the two deeds and the three mortgages show the effort to secure and collect antecedent debts from aged and ignorant persons; that though the father had such mind and memory as to do his will in the respective deeds to his son and daughter, it was a part of the effort to secure the antecedent debts to the bank; that the son paid for his land by discharging the said antecedent debts of the father and family (including Fannie's debt to one of the banks under a Federal Land Bank loan); that the daughter Fannie Thomas was serving the father faithfully in his care and attention while he was enjoying a very ripe old age of some ninety odd years when the deed was made by the father to her; that Fannie and her husband Will Thomas were also ignorant persons, unable to read or write, and Will Thomas at the time was serving as tenant or laborer for one of the executive officers of the bank and Fannie's husband (Will Thomas) and the officer of the bank were active agents in the procurement of the said deeds and mortgages; that when the several mortgages, including the one sought to be foreclosed, became due and payable, whatever crops had been made on the place and the property embraced as security in the mortgages were, respectively, delivered to the bank and that then said Will Thomas (husband of Fannie Thomas) ceased to live with the said Fannie and was not further interested with her or in this behalf. The whole picture presented by the pleadings and the record impresses us that this is a case within the authorities cited. Kirby v. Arnold, supra; Abercrombie v. Carpenter, 150 Ala. 294, 43 So. 746.

It follows from the foregoing that there was error in the decree of the court in holding that Fannie Thomas "comes into court with unclean hands," and the same is reversed and one here rendered cancelling the mortgage on the land and the auctioneer's deed made in pursuance therewith in the attempted foreclosure of the mortgage of March 5, 1932, which is here declared void.

Mandamus was granted to the clerk and register to send transcript in Ex parte Andrews, 231 Ala. 530, 165 So. 839, and the first appeal is reported as Andrews v. Thomas et al., 232 Ala. 649, 169 So. 303, touching the security for costs, which are not questions to be ascertained by this appeal.

In accordance with the decision herein rendered, the trial court will make appropriate orders, cancelling the mortgage of record in the probate office and the auctioneer's deed as recorded therein.

Reversed, rendered and remanded.

GARDNER, C. J., and BROWN and LIVINGSTON, JJ., concur.